IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENELOPE BELL,

Plaintiff,

Civil Action No. 25-1161

vs.

CITY OF CLAIRTON, et al.,

Defendant.

- - -

Transcript of Oral Argument on May 18, 2026, United States District Court, Pittsburgh, Pennsylvania, before Judge Nora Barry Fischer, Senior District Judge.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Sharon L. Wigle, Esquire |
| For the City of Clairton: | Sarah Cobbs, Esquire |
| For Eric Fusco: | Allison N. Genard, Esquire |
| For Duane Ringgold: | Todd J. Hollis, Esquire<br>Steven M. Toprani, Esquire |
| Court Reporter: | Sharon Siatkowski, RDR, CRR, CRC, CRI<br>700 Grant Street, Suite 6260<br>Pittsburgh, Pennsylvania 15219 |

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

P R O C E E D I N G S

(1:33 p.m.)

THE COURT: Good afternoon, everyone. For those of you who don't know me, I'm Judge Fischer, and I'm currently assigned this matter styled Bell v. City of Clairton, et al., filed at Civil Action No. 25-1161.

Present and appearing for the plaintiff here this afternoon is Sharon Wigle, representing Plaintiff Penelope Bell, and I understand Ms. Bell is also here in the courtroom.

Representing the defendant, City of Clairton, is Sarah Cobbs, Esquire.

Representing the defendant, Duane Ringgold, we have both Todd Hollis and Steve Toprani. I understand Mr. Hollis has a competing matter with Judge Haines, and he's being given leave at 2:00 so that he may participate in that matter, and then he'll return to the courtroom.

Finally, for the defendant, Eric Fusco, we have Allison Genard, who is also present here this afternoon.

Now, as I indicated, Ms. Bell, who is the plaintiff, is here, along with her husband and a child. In addition, I understand John Wigle is also present here today.

And I welcome to the courtroom two of our summer interns, Elizabeth Solar and Isabella Gibson, both of whom are currently assigned to Judge Colville, one of my colleagues on this bench.

Now, as counsel well know, we have a number of motions to address in this case. And to that end, it will be the Court's intention to first address the rule to show cause, and then I'm going to go through the various motions to dismiss.

Relative to these motions to dismiss, I would note that Mr. Fusco, through his attorneys, filed the first motion as it relates to the amended complaint. That was filed on January 2, 2026. On the same date later in the day, we also received a motion to dismiss for failure to state a claim by the City of Clairton. And then, ultimately, we received a motion for judgment on the pleadings by Defendant Duane Ringgold. And, of course, we've also received responses to these various motions and pleadings.

And I generally like to take things in chronological order, although I would note that the City of Clairton particularly addresses a number of issues. So it might make sense in this case to hear first from the City of Clairton, and then hear from the remaining Defendants as to their particular defenses.

And I would also advise the parties, as well as counsel, that certainly the Court has reviewed, first, the initial complaint and the various motions to dismiss that were filed. And in the Court's discretion, and given the nature of the complaint, and in line with Third Circuit precedent, the

Court did permit an amended complaint. So, we are looking at the amended complaint, for all intents and purposes, the initial complaint; it's not a nullity. And as I said, we're going to be looking at these various motions to dismiss.

Now, the Court would also note that the plaintiff withdrew her Title VII and ADEA claims against the defendants, Eric Fusco and Duane Ringgold. That occurred at Docket Numbers 38 and 69. So by court order, on May 6, 2026, at Docket No. 71, the Court dismissed those claims with prejudice. So they are no longer at issue relative to those Defendants.

Yes, Mr. Toprani?

MR. TOPRANI: May I speak to that issue briefly?

THE COURT: Okay.

MR. TOPRANI: There was a brief filed last night, Document 74, it was around 11:00 p.m., by the plaintiff where she reasserts argument, beginning on page 2 of 7 -- I'm sorry, page 3 of 7, that the ADEA and Title VII claims at Counts VI through VIII remain viable against Defendant Ringgold, our client. We also agree with the Court that that's against the prior order where they were stipulated and dismissed with prejudice.

So, I just wanted to note that for the record, that Plaintiff's counsel, it appears, continues to serve individual liability against Defendant Ringgold in that late-filed brief,

Judge.

THE COURT: Yes, I noticed that that brief was filed very late on a Sunday. The Court had the opportunity to read that brief, and I have some other questions relative to that brief. But thank you for highlighting that issue.

MR. TOPRANI: Yes, Your Honor.

THE COURT: At this point, Ms. Wigle, is there anything you want to say relative to page 3 of 7 as it relates to your reply brief at Document Number 74 that was filed yesterday?

MS. WIGLE: Yes. I wanted to say that I did file the response to your motion to show cause, and with that, I did correct all the mistakes I made.

What happened, I was going on vacation, and I did not even see the motion you filed until a later date. And then what happened, I couldn't find the original brief I filed. So what I did, when I came back from vacation, I re-filed the brief.

And then what happened last night, when I was looking through my records, I did find the original brief. It didn't have the corrections, but I went into Lexis and I made the corrections, and then I submitted that.

But like I said, that was the only problem that I had with it. And like I said, I would never misrepresent to this Court or do anything like that, and I did correct all the

mistakes I had. And so, I would like to move forward with the case and make my argument.

THE COURT: Well, to that end, I think Mr. Toprani's concern is that this re-filed brief, as you style it, at Document 74, addresses individual liability. And I think we had an agreement and the Court entered an order saying --

MS. WIGLE: I'm sorry. I can't hear you. Can you speak up? I'm sorry.

THE COURT: I think we had an agreement, and the Court entered an order back on May 6th, that there would not be individual liability claims in this case as it relates to Mr. Ringgold and Mr. Fusco; correct?

MS. WIGLE: That is correct.

THE COURT: Okay. So we're all on that same page --

MS. WIGLE: Yes.

THE COURT: -- despite the fact that this brief, at Document 74, which you filed in light of the rule to show cause, says otherwise; is that right?

MS. WIGLE: That is correct. What happened, when I filed that original brief, that was before those individual liabilities were dismissed. So that's what happened there.

THE COURT: Okay. All right. Mr. Toprani, is there anything else you want to say at this point?

MR. TOPRANI: I think we can address other aspects of the brief later, Judge, perhaps when we work through the, what

I'll call the state tort claims at Counts I through IV. But I continue to have issue with these types of presented and filed briefs. You know, we received this overnight. Mr. Hollis and I actually conferred at 1:00 a.m., because neither of us have the ability to sleep, unfortunately, and we had to spend time addressing those issues, Your Honor. Actually, I considered filing a response to that today.

I'm satisfied with the discussion on the record. I just want to be clear that those counts, which we previously understood to be dismissed by this Court's order at Docket 74 remain -- I'm sorry, Docket 73, remained -- 72, I believe, Judge, I apologize -- remain dismissed, and we're not going to argue over the viability of those claims today.

THE COURT: That's the Court's opinion; they are dismissed. And to that end, they will remain dismissed as to those claims against the individual defendants.

Now, as I indicated, the Court issued show cause orders in this case. And to that end, and by way of background, I issued an order on March 17, 2026, after my law clerks and I found several deficient citations and links to the Lexis home page in Plaintiff's brief in opposition to Defendant Ringgold's motion for judgment on the pleadings filed at Docket Number 48.

I directed the plaintiff attorney to file an amended brief with corrected citations and also to show cause why the

brief did not violate the Federal Rules of Civil Procedure, particularly Rule 11.

Thereafter, the Court issued a second order to show cause on April 2, 2026, again, directing Plaintiff's counsel to show cause why her response to the Court's previous show-cause order and the allegedly corrected brief submitted in conjunction therewith did not violate Pennsylvania Rules of Professional Conduct, namely, 3.3 and 1.1, as well as the Federal Rule of Civil Procedure 11(b), and why the Court should not issue sanctions for this conduct.

And to that end, as I noted, I've reviewed all of the pertinent filings regarding these show-cause orders, Plaintiff's response, and further briefing by Defendant Ringgold. And as I said at the outset, we'll start off by first hearing argument relative to these show-cause orders and then we'll move on to the motions to dismiss.

I was remiss in not stating at the outset, when we conclude argument here today, I will be ordering preparation of the transcript, and it will be a transcript that each and every one of the parties, I'm sure, is going to want. And to that end, I would suggest that it will be a pro rata sharing of the cost for that transcript.

Also, once we have the transcript -- and at this stage, I would suggest we'll get that in 30 days -- then the Court will proceed to make rulings, not only on the rules to

show cause but also as it pertains to the motions to dismiss, as well as the motion for judgment on the pleadings, so that we can get this case moving.

One other thing I would state for the record, Ms. Wigle: I have gone back through the docket in this case, and to that end, I note in a number of instances the Clerk's Office reports to me errata, and I don't know if you and/or your staff are having difficulties in making filings, but the docket sheet does reflect a number of erratas and clerk's notice of correction.

So with that, we're going to first hear from Ms. Wigle why I should discharge these rules to show cause or not, and then we'll hear from any defense lawyer who wants to speak to that issue.

Ms. Wigle, you may proceed.

MS. WIGLE: Yes. First of all, I wanted to say, with my rule to show cause, what I did is, when I came back from vacation, I corrected all the mistakes I made. I couldn't find the original brief, the original one that I had filed, so I redid the brief.

After I redid the brief, I resubmitted it. I also submitted my motion to show cause saying that I would never intentionally violate the rules, and I would never intentionally do anything to upset this Court or tell them anything that is not true. I did do that.

And then after that, what I did, when I was preparing for this argument today, last night, I found the original document that should have been filed. When I found it, it still had the mis-cites. So what I did is I went into Lexis, and I corrected them, and then I resubmitted that.

Sorry for the late submitting, but I didn't find it until last night. But as soon as I found it, I did submit it.

And like I said, I definitely did correct all the mistakes. I would not intentionally mislead this Court, and I ask this Court to allow this case to move forward.

THE COURT: All right. Thank you, Ms. Wigle.

Now, as I look at the papers, and particularly I'm looking at Docket Number 67, and then I look at your briefing, you advise the Court that you did brief with the assistance of Lexis AI; correct?

MS. WIGLE: I used Lexis. Lexis is the only one I used.

THE COURT: Okay. And to that end, you understand that whether you use Lexis, Westlaw, or any other search engine, as an attorney, you have a duty to verify citations. You understand that?

MS. WIGLE: Yes. Yes.

And I will say that while some of those cites don't specifically rule in my favor, they do stand for the proposition that I cited, and that is definite. That, I know

for sure. And I did not in any way mislead this Court.

THE COURT: Now, relative to the initial briefing, was that your work product, or did you have an associate that --

MS. WIGLE: I do everything myself. I'm a self-employed attorney. I do all the work myself, Judge.

THE COURT: Okay. Who, if anyone, on the defense side wants to speak to the Court's rule to show cause in light of Ms. Wigle's response to the Court?

MR. TOPRANI: I would.

THE COURT: Mr. Toprani?

MR. TOPRANI: Yes. Thank you, and may it please the Court. I rise to address the issues that the Court has indicated, to which Ms. Wigle has supplied some explanation to the Court, and I will preface that by saying some explanation, because I still think there are material deficiencies with the documents that were filed.

I don't bring this to the Court's attention lightly. I do so with reservation.

As we indicated in our brief that was filed at Docket 73 last week, Mr. Hollis and I, both reluctant to weigh in on the issues concerning the use of AI, sort of these vague and moving responses that have been filed to our very clear 12(c) motion -- and I've been litigating cases before this Court since 2004, I've tried cases in civil and criminal court, to

verdict, in front of juries, I've handled appeals to the Third Circuit and the U.S. Supreme Court -- and I'm actually perplexed at the responses that we're hearing today, Judge.

And I don't mean to pile on to opposing counsel. Mr. Hollis and I are co-counsel today, but we once began as adversaries in a case here in federal court. I believe in professionalism, I believe in courtesy, I believe in civility among attorneys. We have not been seeing that.

Quite frankly, Judge, the brief that was filed around midnight last night appears to me to be another attempt to self-serving justification for violations of the clear rules of the Federal Rules of Civil Procedure and the Rules of Professional Conduct.

At no point during the whole litany of these motions that were filed and the show-cause orders and responses did Ms. Wigle even so much as send an email to me or Mr. Hollis.

Again, Judge, those briefs almost always addressed Docket 43, which was our brief in support of the 12(c) motion, the motion for judgment on the pleadings. There was never any attempt to try to cure any of these issues, advise us that perhaps a law that was cited was misleading, that the factual averments weren't correct, and that this was created through, albeit it a paid subscription, it sounds like, one that was not checked.

Now, I'll highlight to the Court, there's a Third

Circuit case, I believe it's the only case cited in the brief that was filed at midnight last night, it's *Cunningham v. M&T Bank*. It's a Third Circuit case out of 2016.

Ms. Wigle just stated to the Court that she believes that, while it doesn't support her direct proposition for relief, which is actually a tolling, it addresses the issue before the Court, which is in response to our statute of limitations claims.

That the remaining four counts, which are all perplexing in their own nature, Judge, they seem to be state tort claims. Count I she has labeled in the amended complaint as sexual assault. That's a crime under the Pennsylvania Crimes Code. There's no corresponding tort for that, perhaps, other than battery. Count II is rape -- again, I'm a former district attorney, I have charged that crime many times, it's under Title 18 of the Pennsylvania Crimes Code, again, not a civil remedy, yet a criminal one -- and intentional inflection.

Turning back to this *Cunningham* case. My concern is it deals with a real estate seller disclosure law under federal law where mortgage companies had to make certain disclosures of contractual requirements that were buried in pages and pages of end notes or end terms, many of adhesive terms in consumer purchasing agreements. Nowhere does it talk about the type of, quote/unquote, justification that she

states, which is an allusion to paragraph 56 of the amended complaint that says, quote, "Snitches get stitches." She's trying to rely upon what would seemingly be Third Circuit precedent, to be dispositive on the issue, to excuse the lack of timely filing in this case by somehow suggesting that she was unable to -- that Plaintiff was unable to pursue their claims in a timely way because of this comment that's attributed to the amended complaint.

That case is not on point. It does not stand for the proposition. It does outline the potential principles of equitable tolling, but there's no relief that the Court could apply to this case, in my opinion, off of a clear reading of that case.

So, it begs the question, Was this another AI hallucination?

Now, granted it not a ghost cite, 814 F.3d, 1567, Third Circuit 2016, will take you to a published opinion. But that opinion, in my viewpoint, Your Honor, not even in dicta supports the type of relief that this brief cites.

So again, it seems to be symptomatic of an AI problem that continues to be unresolved with the Court.

In opposing counsel's description of that case, I think she understands that it doesn't apply. She stated to the Court, and I'm paraphrasing: It doesn't stand for my proposition, but it supports it.

Again, Judge, I feel that this is presumptively her fourth bite at the apple here.

We can talk about the other issues.  I just wanted to respond by indicating that that again seems to be an AI hallucination.  It doesn't seem to advance the claims in this case.

And, you know, I would respectfully rely upon our relief requested in our filing at Docket 73, which is that the plaintiff's claims be dismissed at this point.  There have been multiple opportunities to correct the record.  There have been multiple opportunities to confer with opposing counsel.

I appreciate that she wanted to give the Court a clean view or a full view perhaps by filing at midnight last night.  But I know that's not a rule in this district, but many district courts where I've also litigated in this country, have said you can't file after 5:00 p.m.

So to me, this was just another thinly veiled attempt to add justification to improper conduct.

Mr. Hollis and I have had conversations -- I don't want to speak for him -- but we've been concerned about our own duty to report this type of conduct, Judge.  In fact, one of the reasons we're happy to hear the Court will order a transcription of these proceedings is we may rely upon them to do such a thing.

I'm not stating that in any threatening manner, but

in recognition of what our professional rules require of all Pennsylvania lawyers, is that we report conduct when it is presented to us that appears unethical on its face.

So I'm not here to pile on, Judge, but my client is a young man with a mental disability who, our counterclaim, even the plaintiff's amended complaint makes clear, he was hired to work in the City of Clairton as a laborer as part of a school program for individuals with mental health challenges and diagnoses.

He's been accused of very sharp allegations by the plaintiff. Again, not to be repetitive, but Count I, sexual assault; Count II, rape. That's not criminally charged conduct; that's an effort to prejudice him, in my opinion, in front of the Court when simple terms such as battery and assault and intentional infliction, which are recognizable claims in Pennsylvania, would have been appropriate headings.

So, I'm open to any questions that the Court may have or discussion on these points. I don't want to belabor the issue. But again, I feel that the totality of the conduct, starting with the last, perhaps, 30 docket entries, evidences that this case has taken a dangerous turn because of what appears to be neglect, if not intentional misleading, by Plaintiff's counsel.

THE COURT: Do either other of the defense counsel which to speak to the rules to show cause?

MS. COBBS: On behalf of the City of Clairton, Your Honor, I do not.

MS. GENARD: Not on behalf of Defendant Fusco. I do not, Your Honor.

THE COURT: Ms. Wigle, any rebuttal to what Mr. Toprani has argued?

MS. WIGLE: Yes. The case he's talking about, I think, is *Cetel v. Kiran*, at 460 F.3d 494, 509 (3d Cir. 2006).

In that case, it did not -- in that case they did not hold that the statute of limitations should be tolled, but it does stand for the general principle that, in certain cases, the statute can be tolled.

In this specific case, my client, Penelope Bell, claims that she was raped, sexually assaulted, and then intentional infliction of emotional distress was put upon her. She didn't ask for it; it happened to her.

What happened then, the defendant told her, if she tried to tell anybody about this, "Snitches get stitches." And he also told her -- he put his hands around her neck, and he told her that, "Bitches like this, it turns them on."

With that in mind, she was scared, and that's why she did not come forward until a later date.

In 2024, she tried to come forward and filed a complaint against the -- her supervisor, and when that happened, a couple days later, her tires were slashed.

It has been a long going, uphill battle for her, and she is asking that the Court rule in her favor, let this case move forward, so justice can be done.

And I don't feel that I misrepresented to the Court. If I did, I'm sorry, but I did not mean to, and I never would.

THE COURT: Okay. When you say that she tried to file a complaint against her supervisor, who are you talking about?

MS. WIGLE: Say it again.

THE COURT: When you say that she tried to file a complaint against her supervisor, who are you talking about?

MS. WIGLE: Penelope Bell tried to file a complaint against her supervisor, Eric Fusco.

THE COURT: Okay. Thank you.

Anything further, Mr. Toprani, concerning this additional argument?

MR. TOPRANI: Yes, Judge. I would just simply state that the equitable tolling provisions of *Cunningham v. M&T Bank*, which is the case that is directly cited in the brief filed last night, speaks of those factors that support tolling, which is concealment by defendants.

It states, one, that the defendant actively misled the plaintiff. Two, which prevented the plaintiff from recognizing the validity of her claim within the limitations period. And three, where the plaintiff's ignorance is not

attributable to her own lack of reasonable due diligence in attempting to uncover the relevant facts.

The relevant facts were uncovered apparently, Judge, accepting them as true for purposes of a 12(c) motion, Plaintiffs filed their case on July 31st of 2025, several months after the statute of limitations expired, which by the averments of the complaint centered around conduct that terminated with Mr. Ringgold's leaving employment in March of 2023.

Plaintiff was not deterred from bringing any action. We're here in court in a case that now consumes 73 docket entries where Plaintiff has asserted her right, continues to assert her right to perceive redress through the filing of complaint, amended complaint, and multiple responses to motions.

So Judge, I don't think there's any relief that's available under the case that's cited.

And I just wanted to note for the record that that's a correct reading of *Cunningham v. M&T Bank*.

THE COURT: Thank you.

The Court will take under advisement this argument, along with the written responses to the rule to show cause, and as I said, we'll be ordering a transcript, and then the Court will proceed to enter a ruling as it relates to the rules to show cause.

Mindful of the fact that Defendant Ringgold is also asking the Court for dismissal of the claims against him as part of these proceedings.

So, we're now going to move on to the motions to dismiss.

And as I said, from the Court's point of view, it appears that the City of Clairton has brought forth a number of legal issues and arguments. So, from my perspective, I think I'd like to hear the City of Clairton argue first, and then we'll hear from the remaining defendants and, of course, we'll hear from Ms. Wigle. And as I did earlier, everybody will get an opportunity to reply to each other.

Also, when we conclude here today, if somebody feels the need for additional briefing, we'll consider that. And if I consider it, I'll give you leave to file further brief if it's needed.

So, let's start with the motion to dismiss by the City of Clairton.

MS. COBBS: Thank you, Your Honor.

Would you prefer that I stand here or come up to the podium?

THE COURT: Either works for me as long as I can hear you.

Madam Court Reporter, what works for you?

COURT REPORTER: Judge, she's fine there.

THE COURT: As long as you speak loud and clear, we'll all be able to hear you, Ms. Cobbs.

MS. COBBS: If anybody is having difficulty hearing me, please let me know.

Sarah Cobbs on behalf of the City of Clairton, Your Honor.

We filed our motion to dismiss today, asserting several theories. But before I get into those, I would like to give Your Honor a brief background of the case.

Both Ms. Bell and Mr. Ringgold were employed through the City Works Department of the City of Clairton. They began their employment in 2018, roughly.

Mr. Ringgold was hired through a program that worked with local schools to provide employment for individuals with disabilities. Ms. Bell was also hired on as -- initially a temporary worker, and then became a full-time employee.

Ms. Bell is no longer employed by the City of Clairton.

THE COURT: When did she leave?

MS. COBBS: She was terminated in December of 2025. So that is a development that occurred after the filing of our brief, I wanted to clarify that.

THE COURT: December, you said?

MS. COBBS: December. I believe it was at the very end of December.

MS. WIGLE: You're right.

THE COURT: Okay. So, Ms. Bell is now terminated as of December 2025; right?

MS. COBBS: Correct, Your Honor.

THE COURT: Okay.

MS. COBBS: The allegations of the complaint span the time period of Mr. Ringgold's employment and Ms. Bell's employment. Mr. Ringgold resigned from his employment with the City of Clairton in March of 2023.

Following his resignment, there were no complaints alleged to the City by Ms. Bell regarding the allegations of the complaint or that any improper relationship had occurred between herself or Mr. Ringgold. That is also absent from the complaint. She does not allege that she reported any of these issues to the City of Clairton following Mr. Ringgold's leaving the City.

We filed our motion to dismiss on the basis that Plaintiff has failed to toll the statute of limitations. We did not receive an EEOC complaint until May 2nd of 2025. In that EEOC complaint, Ms. Bell alleged that Mr. Ringgold had resigned in March of 2023, and that the allegations regarding the sexual assault all occurred prior to his departure.

There was one allegation as to Mr. Fusco, and it was that he had called her names and created a hostile work environment. Because of the name-calling, Mr. Ringgold was

alleged to have repeated the names that Mr. Fusco was calling Ms. Bell.

Based on that, the complaint and the EEOC charge were both silent as to when Mr. Fusco allegedly engaged in this conduct. However, based on the allegation in the complaint and in the charge that Mr. Ringgold joined Mr. Fusco in the name-calling and the harassment, it can be concluded that Mr. Ringgold was still employed with the City at the time that Mr. Fusco was engaging in this conduct.

That would also cut off the allegations as to Mr. Fusco's actions in March of 2023.

Again, we did not receive the EEOC complaint until May 2nd of 2025, exceeding the two-year statute.

THE COURT: That's when you received it, or is that when it was filed?

MS. COBBS: That was when it was filed. It was very quick. The EEOC actually discharged it seven days later and issued the right-to-sue notice.

So it was a very quick turnaround. It was filed May 2nd of 2025 and discharged May 9th.

THE COURT: Okay. And where was all of that in this record?

MS. COBBS: I do not believe if counsel in her amended complaint refers to the EEOC charge --

THE COURT: No, she does not.

MS. COBBS: Okay. I just wanted to give Your Honor a background.

THE COURT: The amended complaint is woefully inadequate in terms of dates.

MS. COBBS: I would agree with Your Honor.

THE COURT: But in terms of your own motion to dismiss, have you asserted these particular dates and have you supplied any exhibit that would permit the Court to verify these dates?

MS. COBBS: I do not believe -- I know for a fact, I did not attach the EEOC right-to-sue letter, Your Honor. I believe we referred to the complaint, and I did refer to the date of the EEOC complaint being filed in support of our position that the matter was untimely and did not meet the requirements under the PHRA and the ADEA, but I did not attach any documents.

I would be happy to supplement our brief and provide those documents to Your Honor following argument.

THE COURT: Okay. Do you have any further argument as outside of the statute of limitations?

MS. COBBS: Yes, we did, Your Honor. We also raised claims that not only were the ADEA claims time-barred, but also that any 1983 actions against the county were also time-barred due to a 1983 action following the state law tort statute of limitations, which is two years.

Again, the complaint in this matter was not filed until July 31st of 2025, which would place any instances occurring before July 31st of 2023 as untimely.  None of the allegations in the complaint, outside of the vague allegation that Ms. Bell's tires were slashed, fall within that time period.

I would also note to Your Honor that the allegation regarding the slashing of the tires does not allege that Mr. Fusco is the one who slashed her tires, nor does it conclude that any person acting on behalf of the City was involved in the slashing of her tires.

So, we would take the position, Your Honor, that it has not been pled, that the City had any involvement or any notice that those tires being slashed had anything to do with Mr. Fusco or Ms. Bell's employment with the City.

We also raised the Political Subdivision Tort Claims Act for Ms. Bell's tort claims.  She pleads intentional infliction of emotional distress and also negligent supervision.

Neither -- well, the intentional infliction of emotional distress does not fall within one of the nine exceptions to the Political Subdivision Tort Claims Act.  Nor did Ms. Bell provide timely notice to any of her claims within the six-month period allowed under the Political Subdivision Tort Claims Act.

So we raised that in our motion to dismiss.

We also raised that Plaintiff failed to state a claim for age discrimination under the ADEA or the PHRA, also cognizant of our previous argument that those are facially time-barred.

She doesn't allege that any of the other employees received a promotion that she claims she was passed over for related to her age and her gender. It's the City's position there were no promotions given at all, but Plaintiff does not plead that anybody received better treatment or disparate treatment from herself.

So that is the basis for her failure to state a claim as to age discrimination and gender discrimination.

And then, we also raised that Plaintiff failed to state a claim as far as a 1983 action. There are no allegations, other than vague conclusory allegations, as to any policy or custom put in place by the City. She only pleads that a policy or a custom led to the violation of Plaintiff's constitutional rights. It is our position, Your Honor, that that does not meet the burden required to state a claim for a 1983 action.

And just to briefly touch on Plaintiff's response. When she filed her response in opposition, she cites to the continuing violation doctrine in that her response is Document Number 39.

We filed a reply at Document -- or Docket 47, alleging that the continuing violation doctrine focuses on a continued unlawful act, not the continued ill effects from the original violation.

And the Third Circuit has also cautioned that the continuing violation doctrine is not a substitute for a plaintiff's awareness of and the duty to assert his or her rights, and it does not apply when plaintiffs are aware of the injury at the time that it occurred.

And I think that's where Plaintiff has not met her burden and cannot overcome the hurdle of the continuing violation doctrine. This is not something that continued, nor does she allege that it continued, after Mr. Ringgold left the employment of the City of Clairton in March of 2023.

Rather, the complaint is silent that there was any continued contact between Mr. Ringgold or Ms. Bell after he left his employment. She was fully aware of the injury that she alleges that she sustained. She alleges that she was raped for a period of five years. It's hard to believe that somebody wouldn't be aware that that was something that was an injury at the time.

So allowing her to proceed under the continuing violation doctrine is not what that doctrine stood for. That is a doctrine that allows for proceeding when the original injury occurs within the statute-of-limitations period and

then continues after, and we don't have that here.

She doesn't allege that from July of 2023 through the present Duane Ringgold continued to threaten her, continued to rape her, continued to harass her. That is not what we see here. We see a very definitive time period and a very definitive ending as alleged in her complaint, and that does not allow her to proceed under the continuing violation theory.

Plaintiff raises other allegations, but I believe that the continuing violation theory is the primary theme. And I'll allow counsel to respond to my arguments before I address anything else.

THE COURT: One question, Ms. Cobbs. Was there a police report relative to this alleged rape?

MS. COBBS: No, Your Honor.

THE COURT: So no police report, no police investigation?

MS. COBBS: Your Honor, I believe that there was a police investigation that ended in Ms. Bell's stating that she did not want to pursue charges.

THE COURT: Okay. When did the police investigation take place?

MS. COBBS: That was after the Loudermill hearing. I want to say that would have been in late 2024.

THE COURT: Late 2024?

MS. COBBS: Yes. There is a lot of background information that is not pled that I would -- will gladly get into if we get into the motion-for-summary-judgment stage, but I don't believe is relevant to the motion to dismiss in front of Your Honor today.

THE COURT: And correct me if I misheard this. Relative to the Political Subdivision Tort Claims Act, you're saying that Plaintiff and/or counsel did not provide notice as required to under the statute; right?

MS. COBBS: Correct. And also the Political Subdivision Tort Claims Act doesn't apply to intentional acts, which is what was pled. And then also for the negligent supervision, there was no notice given at any time by Plaintiff as to what was occurring, allegedly.

THE COURT: Okay. Another question, Ms. Cobbs. Were both Mr. Ringgold as well as Ms. Bell union employees?

MS. COBBS: They were.

THE COURT: Which union are we dealing with?

MS. COBBS: I will have to get that information for you, Your Honor. I am not -- off the top of my head, I do not know.

MS. GENARD: If I may?

THE COURT: I'm sorry. Ms. Genard, do you have that?

I'll follow up with you on that because another question the Court had was, was there any grievance

proceedings?

MS. COBBS: Your Honor, I can answer for you. It's the Teamsters Local Union Number 205.

THE COURT: 205?

MS. COBBS: Yes.

THE COURT: And then my question is, was there any kind of grievance proceedings?

MS. COBBS: There were no grievance proceedings related to Mr. Ringgold.

There was a Loudermill hearing that occurred regarding Ms. Bell related to -- I don't want to misspeak, Your Honor. I will look into that. But there was a Loudermill proceeding related to Ms. Bell wherein, for the first time, the allegations of rape, or a consensual relationship initially, were stated by Ms. Bell.

And then after the Loudermill hearing is when the City reported it to the police because of the allegations that Ms. Bell later stated, that it was not a consensual relationship, and the City felt the need to get the police involved at that point.

THE COURT: Okay. So what was the date of the Loudermill hearing?

MS. COBBS: I will have to get that for Your Honor as well. I can find it in my email.

THE COURT: Okay. Would that be in 2024?

MS. COBBS: That would have also been in 2024.

THE COURT: Was Ms. Bell represented by counsel, or did she act on her own relative to the Loudermill?

MS. COBBS: I believe she had a union representative with her. I do not believe that she had counsel. I know that the former solicitor was present on behalf of the City of Clairton, as well as Howard Bednar and various members of the Human Resource -- or Human Works Department.

THE COURT: Who is the former solicitor?

MS. COBBS: Deron Gabriel.

THE COURT: Say that again.

MS. COBBS: It's Deron, D-E-R-O-N. And the last name is Gabriel, G-A-B-R-I-E-L.

THE COURT: Who is the current solicitor?

MS. COBBS: Steve Matta. No, Gary Matta. Sorry. M-A-T-T-A.

THE COURT: Okay. Thank you, Ms. Cobbs, for that argument.

We're going to hear from Ms. Wigle in response to the City of Clairton's motion to dismiss.

MS. WIGLE: Okay. First of all, regarding the statute of limitations, we believe, just like we believe with Ringgold, that the statute of limitations should be tolled. The reason being, because of the statements that were made by Ringgold and also putting his hands around her neck and

everything he did, it actually froze her in time that she was unable to move forward. She did try to come forward in 2024, and I believe that was right either before or after the Loudermill hearing, and she did try to come forward and complain, but then two days after she filed that complaint, her tires were slashed. And then she did nothing until she talked with me. And she didn't hire me until 2025, and that's when we determined that she should at least try to file this case to move forward and see what she could do with it because of everything that happened to her.

And that's the first argument.

Secondly, regarding negligent supervision, the first element you have to prove for negligent supervision is the organization has to try to prevent intentional harm by an employee. In this case, Duane Ringgold committed intentional harm against Penelope Bell, and he did it on the premises of the -- of Clairton. Secondly, an assault occurred on the premises. Third, the City knew or should have known of the misconduct of Ringgold, particularly by 2024, and they did nothing.

Also, there were many threats by both Ringgold; Fusco, her supervisor at Clairton; and also a City manager named Howard Bednar. They constantly harassed her and supervised her.

It wasn't one specific event. It was an ongoing,

what they call a continuing violation, and it was constant.

And with that in mind, we would ask that this Court allow these cases to move forward.

THE COURT: Now, Ms. Wigle, in addition to the bar of the statute of limitations, Clairton is also arguing that in this particular instance, that the Political Subdivision Tort Claims Act also --

MS. WIGLE: They're saying --

THE COURT: Don't speak over me. It makes it difficult for the court reporter.

MS. WIGLE: Okay.

THE COURT: So, what is your response to the bar of the Political Subdivision Tort Claims Act? As you know, the statute has nine explicit exceptions. You've got to fit within those exceptions. If you don't, then you're barred.

And in addition, generally, because we're dealing with the Political Subdivision Tort Claims Act, intentional acts are not covered. So what's your response to that?

MS. WIGLE: Yeah. First of all, because intentional acts are not covered, we would argue that what Duane Ringgold did to her was an intentional act of rape, sexual assault, and intentional infliction of emotional distress. Therefore, that would not be covered under the Claims Act and should move forward.

Secondly, if you try to get it under the act, you

would look to where it says negligence -- I think I'm doing this right -- it says, "Negligence on the property against the person."

Again, with that in mind, that is covered under the Act. So either way I think it is covered.

THE COURT: Okay. Now, you've averred that Mr. Ringgold allegedly made this assault and rape of Ms. Bell, your client.

MS. WIGLE: Yes.

THE COURT: And this occurred on City property. And to that end, do you know if Ms. Bell, or you on behalf of Ms. Bell, sought out Workers' Compensation?

MS. WIGLE: Do I -- do I want to ask her what?

THE COURT: Workers' Compensation.

MS. WIGLE: I know she never applied for Workers' Compensation. That, I know for sure.

THE COURT: Ms. Cobbs, what's your further response?

MS. COBBS: I'll try to keep it brief, Your Honor.

Counsel referenced a complaint that was made by Ms. Bell in 2024. I just want to make clear for the Court, that complaint was not related to the sexual assault that Ms. Bell now alleges against Mr. Ringgold. That was related to Mr. Fusco.

If I could step back -- and I recalled what the basis for the Loudermill hearing was -- there was a situation where

Ms. Bell made racist comments about Mr. Fusco's wife that were overheard by multiple members of the City Works Department and reported to Mr. Bednar, who instituted the Loudermill hearing.

So that was the basis for that Loudermill hearing against Ms. Bell in 2024. Again, it was unrelated to any of the allegations in the complaint, any of the allegations raised against Mr. Ringgold.

And with regard to the relation back. Counsel said that in 2024, the slashing of her tires is what allows her to proceed under the relation-back theory.

Mr. Ringgold was no longer an employee with the City at that time. He resigned in March of 2023. And so anything that occurred in 2024 cannot be used to relate back to any of the claims related to Mr. Ringgold simply because he was no longer an employee, nor does Ms. Bell allege that Mr. Ringgold is the one who slashed her tires.

And even if that was the position that she would take, Mr. Ringgold was no longer an employee of the City and not under their control any longer.

Just to briefly address Your Honor's question about the political subdivision as it applies to intentional acts.

The way that the Political Subdivision Tort Claims Act reads is that, "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to any person or property caused by any

act of the local agency or employee thereof or any other person. There are nine exceptions to the immunity, but none of the exceptions apply to the intentional torts. So when Plaintiff pleads an intentional tort, it does not and cannot fall under any of the nine exceptions that bar recovery against the City."

So it would be the City's position that by pleading the intentional acts, Ms. Bell has pled herself out of any claims arising from torts against the City of Clairton.

THE COURT: Thank you for that, Ms. Cobbs.

Anything further, Ms. Wigle, relative to Clairton?

MS. WIGLE: Yes. I would just say regarding the continuing violations theory, not only was that theory against Mr. Ringgold, but it was also against Eric Fusco. And because of that, because of the Clairton -- because Clairton employed Mr. Fusco.

THE COURT: Okay. Thank you for that.

All right. I think it makes sense then to hear now from counsel for Mr. Fusco.

So, Ms. Genard, if you will provide your further argument as to Mr. Fusco's motion to dismiss.

And the Court is well aware that Mr. Fusco has his own lawsuit pending in front of Judge Stickman.

MS. GENARD: Correct.

THE COURT: You may proceed.

MS. GENARD: Thank you, Your Honor. Allison Genard for Defendant Fusco. May it please the Court.

I don't want to reiterate a number of the arguments made by Ms. Cobbs because they are similar, as the Court has noted.

Originally, there were five counts against Mr. Fusco, and three of them were under Title VII and the ADEA and, therefore, they are now off the table. So I'll narrow it down to what remains.

In addition to the arguments made about tolling and the statute of limitations which we put forth in our brief also and argued pretty much to the same extent, that there's no allegations that take it within the statute of limitations. And even then, the one event in June of 2024 does not bring the claims into the statute of limitations because she only said that she made a complaint and that her tires were slashed. There are no allegations tying Defendant Fusco to that, where that happened, when that happened, any other context that would create liability on his behalf.

In addition to that, too, the amended complaint is completely devoid of any allegations that Mr. Fusco ever made any threats as far as reporting or any kind of complaints to the plaintiff in this matter. So that also negates any argument that there's tolling against him.

Further, though, when it comes to the intentional

infliction of emotional distress claim, our argument is that there is no claim stated with the amended complaint.

As the Court is well aware, an IIED claim requires extreme and outrageous conduct. The only allegations against Defendant Fusco are, at best, inappropriate comments about the plaintiff's age and gender. There's no context to those claims, though, either when they happened, how often they were happening, and what context they were happening that would create that kind of intentional infliction of emotional distress.

The Courts are also very clear that it very rarely occurs in an employment context because that threshold is so high. Our argument is that the plaintiff has not alleged a case of IIED against Defendant Fusco.

When it comes to the Section 1983 claim under the Equal Protection Clause, we made the same arguments about the statute of limitations, so I will not reiterate that here, but we also feel that she failed to state a claim, one of the biggest elements of that being a lack of adverse employment action. As I just noted, there's no context given to these comments. And the courts have held over time that errant comments, while inappropriate, without further context do not create a hostile work environment.

She was employed from 2018 to 2025, and there's a handful of comments that could have been said at any rate or

time, and we don't really know, and it's our argument that the allegations don't rise to a hostile work environment.

Outside of that, there are no allegations of an adverse employment action that would bring the Equal Protection Clause into fruition for her complaint.

There is no termination, there is no suspension, there is no demotion, and arguably, we get to the one and only allegation, which was a denial of promotion. As we argued in here, Defendant Fusco had no power to make that authority. Under the Third Class City Code, those kind of decisions are either made through the civil service process or by the City manager, which Defendant Fusco is not.

So to the extent, and we are of the same opinion of the City, that there was no promotion even during that timeframe that she would have been denied, he doesn't have the ability to make those decisions as it is.

I believe that is all I had in addition to the arguments that we have in our brief that Ms. Cobbs already covered.

THE COURT: Thank you, Ms. Genard.

Any response, Ms. Wigle, to what Ms. Genard has to say on behalf of Mr. Fusco?

MS. WIGLE: First of all, we'd make the same statutory argument for the tolling of the statute of limitations.

Secondly, Fusco had a duty to supervise his employees since he was a supervisor over both Mr. Ringgold and Penelope Bell. He did not supervise Mr. Ringgold. Furthermore, he breached his duty when he didn't supervise Mr. Ringgold.

And also, he breached the duty by himself during this conduct to constant remarks and innuendos towards Ms. Bell on a consistent and constant basis. He promoted a hostile work environment, never investigated the rape incident, even when Penelope Bell, after the rape, came back to Clairton, to the City building and was crying. She was crying and upset, and he never asked her anything about it.

Furthermore, Eric Fusco committed intentional infliction of emotional distress because the comments he made were outrageous and extreme because they didn't just happen once or twice. They happened on a consistent and regular basis. And they were beyond the bounds of human decency.

To establish a hostile work environment by Eric Fusco -- involved discriminatory comments and ridicule and insult -- he did all of the above. For that reason, we would ask that all charges remain intact against Eric Fusco.

THE COURT: Ms. Genard, any response?

MS. GENARD: Very briefly, Your Honor. As counsel just stated that he had a duty to supervise, but none of those allegations that were just made in the argument are contained within the amended complaint.

THE COURT: On the amended complaint. Not what's in briefs, not what's in oral argument. The amended complaint controls. Go ahead.

MS. GENARD: Correct, Your Honor.

And so without that, again, as you just accurately noted, it cannot be amended through argument.

In relying on the fact that she came back crying one day at work, there's no allegation that she made a complaint or that there were conditions, outside of coming back and crying one time, that he should have been in any kind of duty to supervise. Again, that is not one of the allegations here either.

He is not being sued under a failure-to-supervise theory; merely an Equal Protection Clause claim, which, as I stated earlier, has not been stated in the facts of the amended complaint.

Thank you.

THE COURT: Ms. Wigle, anything further?

MS. WIGLE: I would just say further discovery will show Mr. Fusco's more direct involvement in the situation and exactly the things he did wrong.

THE COURT: Okay. That is if we get to discovery.

Now, relative to these comments that Mr. Fusco allegedly made, i.e., women belong in the kitchen; menopause, he refers to as mental pause; the fact that he called Ms. Bell

a number of names, and then went ahead and allegedly insulted her on Facebook, the complaint also says that this kind of conduct is reported to George Glagola, G-L-A-G-O-L-A, who is the code enforcement officer of Public Works, but no action was taken to address the situation.

Did that occur or not?

Ms. Genard, do you know anything about George Glagola?

MS. GENARD: I do not, Your Honor. I do not know if that was reported to him.

THE COURT: Do we know, is Mr. Glagola still with the City of Clairton?

MS. COBBS: I can speak to that, Your Honor.

Yes, Mr. Glagola is still with the City of Clairton. And from the documents that I've seen from the City, there were no reports made to Mr. Glagola that he noted.

THE COURT: Okay. By the way, does the City of Clairton have any kind of employee handbook, policy and procedure, that speaks particularly to social media?

MS. WIGLE: I'm sorry. Say that again.

THE COURT: Which speaks to social media. I'll ask Ms. Cobbs first.

MS. COBBS: Your Honor, they do have a Public Works handbook or a policy handbook. I do not know if it speaks to social media. It's my understanding that it hasn't been

revamped in a while. So I would guess that it is not speaking to social media, but I can certainly confirm that for Your Honor.

THE COURT: Okay. Ms. Wigle, anything further that you have to say in response first to what Ms. Genard argued, that your complaint is devoid of a failure-to-supervise theory?

And then, relative to the Court's questioning about what, if anything, it was that Ms. Bell did in, quote, reporting the, quote, harassment and discrimination to George Glagola?

MS. WIGLE: Yeah. Regarding the supervisor, it was well known, and it's in the complaint, and also well known that Eric Fusco was, in fact, her supervisor and that Clairton was the one that supervised him. So that is first.

Secondly, regarding the incident that you're talking about, he took -- how do I want to put this -- he took -- give me a minute. He took -- wait, could you repeat the last question? I'm sorry.

THE COURT: I was referring to your allegations that Ms. Bell took these alleged remarks of Mr. Fusco and reported them as, quote, harassment and discrimination to George Glagola.

MS. WIGLE: Yes. What happened is, there was -- she wasn't the only one that was harassed by Fusco. There were

other people harassed, and that Glagola was one of the ones that also harassed. So he will definitely come forward and testify, if we need him to, if the case goes forward.

THE COURT: Okay. All right. Anything further then by way of the motion to dismiss brought by Mr. Fusco?

(No response.)

THE COURT: Seeing none, then we're going to move on.

We have a motion for judgment on the pleadings on behalf of Duane Ringgold. Mr. Toprani, I guess, is going to argue. Mr. Hollis has been in and out. I guess he got called back to the matter that he was attending to earlier.

Mr. Toprani, if you would like to proceed on your motion for judgment on the pleadings.

MR. TOPRANI: Yes, Your Honor, I would. Thank you again, and may it please the Court.

The Court already heard from me during the opening portion of the hearing concerning what I would call the equitable reasons why we feel the 12(c) motion should be granted. But I'd like to briefly talk to you about the procedural and legal issues as well.

Defendant Ringgold sits here, somewhat differently postured, although I believe the same analysis applies, wherein we filed an answer and a counterclaim in essence closing the pleadings as it relates to the claims brought by and against, I should say, Ms. Bell and Mr. Ringgold.

So that instance, Your Honor, I feel that the amended complaints, averments take an even heightened importance in determining how -- whether or not the 12(c) motion should be granted.

Plaintiff's counsel has had three opportunities to brief this matter. On February 16th of '26, at Docket 48, the first reply brief was filed. At Docket 69, which I believe was an apparent response to a show-cause order, the second brief was filed. And again, last night, a third and final brief was filed.

The reason I highlight these is there's an evolution of an argument between each of them. Docket 48 was a six-page brief that cited three cases: *Garvin v. Philadelphia*, 354 F.3d, 215; *Doherty v. Teamsters Trust Fund*, 16 F.3d, 1386; and *Cunningham v. M&T Bank*. I believe those citations were addressed by the Court in its subsequent show-cause order as AI hallucinations.

Docket 69 then asserts a 13-page brief, seven pages longer, almost double the size of the prior brief, citing again *Cunningham*, and two other cases, *Beatos*, B-E-A-T-O-S, and *Cetel*, C-E-T-E-L, which again, I believe to be -- and I believe the Court also acknowledged -- were potentially hallucinogenic AI cites.

Which brings us to another reading of *Cunningham*, which was put in the record last night, shortly before

midnight. *Cunningham* does not stand for the proposition that defends the extension or equitable tolling of the statute of limitations. As other defense counsel has indicated to this Court, there's a two-year statute of limitations governing these claims. The claims against Defendant Ringgold differ from those, in some respects, with Defendant Fusco.

The amended complaint at Docket 28's Count I is for sexual assault. As I noted at the beginning of my presentation to the Court, that is not a cognizable claim under the laws of Pennsylvania. That is a criminal statute, not a civil tort.

Count II deals with rape. Again, a criminal statute, no corresponding civil component other than perhaps battery, which brings us to Count III.

And intentional infliction of emotional distress, a count levied by Ms. Bell against both Mr. Ringgold and Mr. Fusco.

What's interesting is, if you turn your attention to the brief filed last night, for the first time they talk about this equitable tolling issue where, quote, "Snitches get stitches" and an alleged tire-slashing event supports the basis for extending the statute of limitations.

I can represent to the Court, after reviewing Docket 28, nowhere in those four counts levied against Mr. Ringgold by the plaintiff is there any reference to even the

intentional infliction of emotional distress resulting from a tire- slashing incident. Those allegations are threadbare. They're against the specificity requirements that govern pleadings in this court, and that should be stricken on that basis alone.

As we work our way through the statute of limitations, Judge, the four counts, and even setting aside Counts I and II, which I believe are incognizable, but even arguing that they're separate counts for battery, any claim under the Pennsylvania Judicial Code for assault, battery, or to recover damages for injury to person or property is governed by a two-year statute of limitations. That's 42 Pa. S.C. 5524.

The Judicial Code was interpreted, as I noted in my brief at page 4, at Docket 43, in *Fine v. Checcio*, 870 A.2d 850, 857, the Pennsylvania Supreme Court in 2005 said, "In a suit to recover damages for personal injuries, the right arises when injury is inflicted."

The injuries were only inflicted, as Plaintiff alleged in her amended complaint, between August of 2018 and March of 2023. There's no averment that she suffered any personal injury after March of 2023, except for a threadbare reference to a purported slashing event in the months that followed.

Again, Judge, because of that two-year limitation

period, the complaint that was filed at this docket, I believe, back on 7/31, if I'm not mistaken -- allow me to consult with the docket quickly -- 7/31 of 2025, is months late.

There was no effort to exercise her rights. They were known at that time. Ms. Wigle indicated to the Court that she was hired in 2025. I don't know when; that's not for my review.

But it does seem that these were intentionally delayed by the plaintiff, and now they're seemingly trying to extend the statute of limitations through threadbare allegations.

I would just finally note that the *Cunningham* court cited to a United States Supreme Court case. It's an old one from 1944. It's the *Order of Railroad Telegraphers v. The Railway Express Agency*. And it said -- the Supreme Court announced the longstanding rule concerning statute of limitations. It said, "They are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."

That's exactly the preventible circumstance that we're facing here today.

These allegations do not support expanding the statute of limitations. The legal authority supplied by the

counterclaim plaintiff, in our instance, offers no support, no equitable relief for adjustment.

And again, Your Honor, setting that legal theory aside for a moment, turning to the show-cause orders that we've already discussed, equity would support striking the brief and granting Rule 12(c) judgment on the pleadings in favor of Mr. Ringgold.

THE COURT: Thank you, Mr. Toprani.

MR. TOPRANI: Thank you.

THE COURT: Welcome back, Mr. Hollis. I did note that you had come back into the courtroom. Is there anything you wanted to add? Do you need to confer with Mr. Toprani?

MR. HOLLIS: No, ma'am, there is nothing more I need to add. Thank you, Your Honor.

THE COURT: Ms. Wigle, your response to Mr. Ringgold's motion for judgment on the pleadings.

MS. WIGLE: Yes. I would just stand on my argument that the statute of limitations should be tolled in this case and the reason goes to the fact that Duane Ringgold intentionally assaulted, raped, and intentionally inflicted emotional distress on Penelope Bell.

Not only did he do this, but he told her that stitches get -- that "Snitches get stitches." And he also said, If you tell anybody, I will put my hands -- he put his hands around her neck and said, "Bitches like this, it turns

them on." I mean, he was very graphic about it.

She went back to the facility, where she was crying, and the supervisor, Eric Fusco, never once approached her or asked her what was wrong. And then this went on from 2018 until 2023, when he actually resigned from the facility. There was constant pressure, constant threats coming from Duane Ringgold and the supervisor, Eric Fusco.

Also, we would request, there was another section of this, and I don't know if you wanted to address it, it said about the former mayor as an indispensable party. We would argue that the mayor is not an indispensable party according to Rule 19(a)(1), and that therefore, that issue should not go forward. We argue he is not an indispensable party.

That's all my argument.

THE COURT: Thank you, Ms. Wigle.

MS. WIGLE: You're welcome.

THE COURT: Mr. Toprani, anything further?

MR. TOPRANI: I would just say as it relates to the motion to join an indispensable party, there seems to be sufficient factual basis to add the mayor as a defendant. However, I would ask that the Court -- I would just withdraw that motion at this time pending the resolution of the 12(c) motion. Perhaps that motion could be mooted by the Court's ruling.

So I would just ask leave, depending on the way the

Court would rule on these proceedings, to reassert that at a later time if needed.

THE COURT: And previously, the Court had made a ruling, I think, in response to co-defendants' request, that we stay any action relative to that motion for joinder until these pending motions to dismiss and the motion for judgment on the pleadings are resolved.

So, is there anything further by way of argument any counsel wants to point out to the Court?

MR. TOPRANI: Respectfully, no, Your Honor.

MS. COBBS: No, Your Honor.

MS. GENARD: No, Your Honor.

MS. WIGLE: No, Your Honor.

THE COURT: Oral argument is concluded.

As I said, I'm going to order preparation of the transcript, the costs to be borne by the parties. In this instance, that will be a quarter for each. And our court reporter should be able to get you the transcript in 30 days. That will take us out to about June 18, 2026.

And the matters will all remain under advisement until I get the transcript, have a chance to review it, and go back against the pleadings and our research to date. And then we would hope to enter our opinion and order.

Now, while we're waiting for this transcript, if any case law develops, particularly in the Third Circuit Court of

Appeals that either or any of you think the Court should be made aware of, you can certainly submit that by way of a letter brief to the Court.

And having said that, given the oral arguments here today, does anybody feel compelled to give me any more briefing on any issue?

MS. COBBS: Your Honor, I would just state that I am happy to provide the EEOC decision and the charge that was filed, if Your Honor would like to have those during her considerations.

THE COURT: Okay. Any objection, Ms. Wigle?

MS. WIGLE: No.

THE COURT: Hearing no objection, if you could file that as a supplement to your motion to dismiss, that would be helpful. Please be mindful of any PII redactions that need to be happening as you make that filing.

Mr. Toprani?

MR. TOPRANI: Yes, Your Honor. Briefly. We do not expect to have to brief the matter further.

But once we review the transcript, my client -- on behalf of my client, I would like to reserve the right to file a Rule 11 motion seeking our own independent relief as it may relate to the various filings that directly related to the 12(c) motion and also incorporated responses in the rule to show cause responses to this Honorable Court.

THE COURT: Okay. So the Court's made a note here and reserved your rights, once you receive and review the transcript.

Ms. Genard, do you anticipate any additional briefing?

MS. GENARD: Not at this time, Your Honor.

THE COURT: Ms. Wigle, do you anticipate additional briefing?

MS. WIGLE: Yes. Would it be possible that I could file a brief on the -- on the statute of limitations extension with updated cases? I would like to do that if the Court has no objection to it.

THE COURT: Well, I thought that you had briefed the issues related to the statute of limitations. No?

MS. WIGLE: Okay.

THE COURT: Okay.

MS. WIGLE: Okay.

THE COURT: So do you think you need some additional briefing on that?

MS. WIGLE: Yes.

THE COURT: Counsel, what's your position vis-à-vis additional briefing on the statute of limitations?

MR. TOPRANI: Your Honor, at least as it relates to Mr. Ringgold -- and I didn't mean to step up in front of counsel, I apologize for that -- it's been briefed three times

at a minimum. Even with a late filing last night, that was materially different than the prior two. I would just oppose that because it's now becoming exceedingly prejudicial for us to continue to respond to one single issue that was raised in a 12(c) motion.

I would note that, you know, it's not common, perhaps, to pursue a summary judgment defense in the context of a 12(c) motion. But the pleadings are closed, and it seems to be the most appropriate time in the interest of judicial economy to address that. I don't think it's in the interest of judicial economy to continue to allow additional briefing by the plaintiff.

THE COURT: Do either other counsel for Fusco or Clairton have a position?

MS. COBBS: Your Honor, on behalf of the City, we would also join in the objection to additional briefing regarding the statute of limitations. Not only did Attorney Wigle have an opportunity to brief the issue in response to our motion to dismiss the amended complaint, she also addressed the issue in her response to our motion to dismiss the original complaint.

So, I believe that Ms. Wigle has had ample opportunity to address any of the issues and case law that she wishes to raise regarding the statute of limitations. And I agree with counsel that it would just simply prolong an

already drawn-out pleading stage.

THE COURT: Thank you, Ms. Cobbs. Ms. Genard?

MS. GENARD: Your Honor, I would echo the same objection, to the extent that any briefing is allowed, that we be given the opportunity to briefly respond to that also. If there is any new and different arguments raised, we want the opportunity to respond to that.

THE COURT: Ms. Wigle, as you know, we spent a lot of time here in these arguments --

MS. WIGLE: I'm sorry. Could you speak up? I can't hear you.

THE COURT: Okay. As you know, we spent a lot of time in the argument today looking at the issue of statute of limitations, equitable tolling, and the like.

MS. WIGLE: Yeah.

THE COURT: You, as well as the other attorneys representing the defendants, have all had sufficient opportunity to brief that issue.

MS. WIGLE: Yes.

THE COURT: The only reason I would permit additional briefing on that is if, between now and the transcript, we get a new decision from the Third Circuit Court of Appeals on statute of limitations and equitable tolling. I don't know what is or is not in their pipeline.

MS. WIGLE: Okay.

THE COURT: But otherwise, I think that the record is set on that issue.

MS. WIGLE: And that's what I was going to say. That's what I would be arguing, if there's anything new, I would like to present it.

THE COURT: Okay. Only if there's something brand-new. Only if there is something brand-new on that issue.

MS. WIGLE: Okay.

THE COURT: Otherwise, the briefing on the statute of limitations and equitable tolling is certainly closed.

MS. WIGLE: Okay.

THE COURT: Okay?

MS. WIGLE: Okay.

THE COURT: Anything else for the Court's attention here today?

MS. COBBS: Not on behalf of the City.

MS. GENARD: Not on behalf of Defendant Fusco, Your Honor.

MR. HOLLIS: None on behalf of Defendant Ringgold -- excuse me, plaintiff -- Defendant Ringgold -- the other side.

MR. TOPRANI: He's really uncomfortable on this side.

THE COURT: Ms. Wigle, anything further on your end?

MS. WIGLE: No, nothing further.

THE COURT: Madam Court Reporter, is there anything you need to do your work? Citations, anything that you need

clarity on?

COURT REPORTER: No, Your Honor.

THE COURT: So the Court does order preparation of the transcript. We'll get that in 30 days. And once we get that, we would hope to enter our opinion within 30 days thereafter.

Mr. Kravetz, do you need anything for the docket, anything you need for your work?

THE DEPUTY CLERK: No, thank you.

THE COURT: Okay. I would be remiss if I didn't point out that Ms. Riley Realing, who is the law clerk who has been assigned to this matter, has also been listening in here today and, I'm sure, taking copious notes.

I appreciate everybody being on time and well prepared. A lot of interesting issues here for the Court to address.

I also appreciate very attentive interns watching, and I'm sure they'll be looking at the docket for our opinions in this case.

So with that, we will conclude here today. Have a good afternoon, everybody.

(Proceedings concluded at 2:54 p.m.)

\- - -

C E R T I F I C A T E

I, SHARON SIATKOWSKI, RDR, CRR, CRC, CRI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

\s\ Sharon Siatkowski___ June 11, 2026
SHARON SIATKOWSKI, RDR, CRR, CRC, CRI Date of Certification
Official Court Reporter